# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kelli Jo Torres | Civ. Case No_____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Dallas Hamm; Shelley Douty; Rock County Sheriff Evan Verbrugge; Rock County; all individuals being sued in their individual and official capacities. | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff, Ms. Kelli Jo Torres, by and through her undersigned attorneys of record, demanding trial by jury of all claims properly triable thereby, for her complaint against Defendants above-named, complains and alleges as follows:

## STATEMENT OF CLAIMS

1.     Plaintiff seeks money damages and equitable relief from Defendants for violating her constitutional rights. She also brings forward supplemental claims for violations of Minnesota state law.

2.     Plaintiff was the victim of egregious conduct by Defendants Dallas Hamm and Shelley Douty, who subjected her to a prolonged seizure for the purpose of conducting an unlawful roadside strip search and body cavity search in violation of the Fourth Amendment to the U.S. Constitution and Minnesota state tort laws.

3.     Plaintiff brings suit under 42 U.S.C. § 1983.

## JURISDICTION

4.     This Court has jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 28 U.S.C. § 2201 (declaratory relief), and 42 U.S.C. §§ 1983 and 1988.

5.     This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

6.     This action arises under the United States Constitution, as applied to state and/or local authorities through 42 U.S.C. § 1983.

## PARTIES

7.     Plaintiff Kelli Jo Torres is a 38 year old woman. She currently resides in Jackson County, Minnesota.

8.      Defendants are all, upon information and belief, Minnesota municipal entities and/or individual members of law enforcement agencies, in an appointed or elected capacity.

9.     Rock County is a political subdivision of the State of Minnesota that can sue and be sued in its own name.

10.    Defendant Sheriff Evan Verbrugge was, at all times relevant, the Sheriff of Rock County.  He is sued in his personal, official, and individual capacities pursuant to Minn. Stat. § 466.01 *et seq*. and other applicable law.

11.    Defendant Dallas Hamm was, at all times relevant, a deputy in the Rock County Sheriff's office. He is sued in his personal, official, and individual capacities pursuant to Minn. Stat. § 466.01 *et seq*. and other applicable law.

12.     Defendant Shelley Douty was, at all times relevant, a deputy in the Rock County Sheriff's office. She is sued in her personal, official, and individual capacities pursuant to Minn. Stat. § 466.01 *et seq*. and other applicable law.

13.     All Defendant law enforcement officers, agents and/or employees were, at all times relevant to this complaint, working as on- or off-duty licensed Minnesota peace officers acting under color of state law and within the scope and course of their official duties and employment as officers.

## FACTS

14.     The violations of Ms. Torres's rights began on November 27, 2018. She was a passenger in a car driven by Derek White through Luverne, MN. Defendant Rock County Deputy Dallas Hamm pulled Mr. White over on the on-ramp to I-90 east.

15.     Defendant Hamm told Mr. White that he was being pulled over for having an air freshener hanging from his rearview mirror.

16.     Defendant Hamm asked Mr. White for his driver's license and insurance. While Mr. White was looking for those documents, Defendant Hamm shined his flashlight over the driver's door cup holders and into the backseat. He saw nothing illegal during this search.

17.     While Mr. White was locating the requested documents, Defendant Hamm asked Mr. White where he was coming from and where he lived. When Ms. Torres asked Defendant Hamm what this was all about, Defendant Hamm ordered Mr. White to step out of the car, making it impossible for him to hand over his insurance and driver's license.

**Unlawful Expansion of the Stop**

18.     Defendant Hamm expressed no further concerns about the air freshener. Once Mr. White was out of the car, Defendant Hamm asked him questions about where he was going and who he had been with. Mr. White explained that they had given a ride to Brian Echternach and dropped him off.

19.     After questioning Mr. White, Defendant Hamm instructed him to sit in front of Defendant Hamm's squad car. Defendant Hamm then went to talk with Ms. Torres. While talking with Ms. Torres, Defendant Hamm requested another squad car.

20.     During the conversation with Defendant Hamm, Ms. Torres asked that she be allowed to have someone come and get her. Defendant Hamm told her she couldn't leave because her story "wasn't lining up" with what Mr. White had said.

**Unlawful Search of Mr. White**

21.     Defendant Hamm instructed Mr. White that he was going to pat him down and asked if Mr. White had anything that could cut Defendant Hamm. Defendant Hamm's search was not for officer safety or for weapons.

22.      Defendant Hamm's search was unlawful.

23.     The only "facts" known to Defendant Hamm at this moment were that Mr. White had not yet provided his auto insurance and he was flustered. This was insufficient to rise to a reasonable suspicion of drug-related criminal activity. While searching Mr. White, Defendant Hamm continued to question him about whom he had dropped off. Mr. White then said it was a person named Brandon. Defendant Hamm asked if this was Brandon Eden. Mr. White said he didn't know that person.

24.     During the pat down of Mr. White, Defendant Hamm did not search his groin area.

25.     In an action that confirmed that he had not been searching for weapons, Defendant Hamm removed Mr. White's hat.  In the brim of the baseball hat, Defendant Hamm found drugs.

26.     After finding drugs, Defendant Hamm and another officer declared that they were going to search Mr. White, including his shoes.  Defendant Hamm explained that since he believed that Mr. White had been lying to them the entire time, they didn't trust him or believe him.

27.     At around this time Defendant Douty arrived on scene.

28.     Defendant Hamm had Mr. White sit on Hamm's squad car and remove his shoes.  When Mr. White told Defendant Hamm that he was cold, Defendant Hamm instructed Mr. White to put his shoes back on and sit on the squad car.

29.     He then asked Mr. White to tell him what they would find in the car.

30.     Mr. White was put in the back of Hamm's squad car where he could get warm.  Defendant Hamm noted how cold it was.  He then approached Ms. Torres, who was sitting in Mr. White's car.

**Unlawful Search of Ms. Torres**

31.     Defendant Hamm told Ms. Torres that he believed what she told him in response to his questions and that he did not think she was lying.  Nonetheless his female partner, Defendant Douty, was going to search her.  At this time, neither Defendant had any reason to think Ms. Torres was armed or dangerous.  Ms. Torres stated that she had

ridden with Mr. White so that she could pick up money from someone who owed her money.

32.     Defendants had no legal right to search Ms. Torres.

33.     Defendants removed Ms. Torres from the car so an unknown third officer who was now on the scene could search the car while Defendant Douty searched Ms. Torres.  Defendant Hamm remained close to Ms. Torres at all times and watched the search. Ms. Torres was told to stand next to Defendant Hamm's squad car, which was out of the view of Hamm's squad-car camera.   During the search, Ms. Torres informed both defendants that she was cold. She was wearing leggings that were not warm and Defendant Douty made her remove her coat for the search.

34.     Ms. Torres was very uncomfortable about the unlawful search being conducted by Defendant Douty.  She informed the Defendants three times that she was not wearing underwear and that "it feels like you're grabbing my crotch."

35.     At that point, Defendants began verbally abusing Ms. Torres for approximately the next 20 minutes.  Ms. Torres repeatedly asked — and at times, begged — both Defendants not to do a strip search on the side of the freeway. They refused to listen to her.  Ms. Torres repeatedly told both Defendants how cold she was, but both Defendants blamed her for her discomfort and took no responsibility for their own unconstitutional and malicious acts.

36.      At times telling Ms. Torres that she wasn't under arrest, Defendants also never informed her why they needed to search her or why they needed to question her about

any suspected crime. In their subsequent written reports, neither deputy explained their reason for searching Ms. Torres.

37.    After Ms. Torres complained that Defendant Douty was touching and probing Ms. Torres's vagina, both Defendants loudly berated Ms. Torres.  Defendant Hamm then handcuffed her.

38.    Defendant Douty claimed that she felt something while searching her vagina but didn't know what it was.  Defendant Douty did not think it was a weapon and suspected it might be a baggie. Defendant Douty yelled at Ms. Torres, "What do you have down there?"

39.    Ms. Torres calmly replied that she had nothing, that she wasn't wearing underwear, and asked if they wanted to take her down to the station to search her.

40.    Defendant Hamm said they wouldn't do that because, despite her already being in handcuffs and in police custody, she would "ditch it."

41.    Defendant Douty again demanded that Ms. Torres tell her what she had "down there."  Ms. Torres again told her that she was uncomfortable.  "I have no underwear on and I feel like you are putting your hands in me and stuff.  I'd rather just go get strip searched the right way and everything."  Defendant Hamm called her a liar.

42.    Both Defendants berated Ms. Torres while she tried to protect herself from being subjected to a strip and body cavity search on the side of the road.  Ms. Torres again asked them to take her to the police station. Defendant Hamm refused.  Defendant Douty asked her, again, what she had inside her.  Again, Ms. Torres said she had nothing, and

objected to Defendant Douty's "putting your hands up in me".  Defendant Hamm suggested she wasn't wearing panties because she was hiding something in her vagina.

43.     Ms. Torres again asked that they sort this out the right way and not on the side of the road.  Instead, Defendants, despite knowing that Ms. Torres did not want to be searched on the side of the road, started searching Ms. Torres's body again, without her consent.

44.     While searching Ms. Torres, Defendant Douty asked "what do you have in your pants?"  To which Ms. Torres responded, "Nothing, but I'd appreciate it if you wouldn't stick your hands all up in me."

45.     Defendant Douty then lost her composure and screamed at Ms. Torres, "What do you have?"  Defendants at the time did not believe that Ms. Torres had a weapon or posed any danger.  Ms. Torres said she had nothing and again asked them to take her to the station.  At this time both Defendants were clearly on notice by Ms. Torres that she did not consent to a strip search on the side of the road and that such behavior was highly embarrassing to her.  Neither Defendant was doing a search for officer safety or a search incident to an arrest.

46.     Both Defendants refused Ms. Torres's pleas.  Instead, they instructed her to widen her legs.  Defendant Hamm screamed at Ms. Torres.  The recorded audio of the incident includes Plaintiff pleading for basic dignity:

Ms. Torres: "I don't think you can do that to me."

Defendant Douty: "It's called a search."

Ms. Torres: "Yeah but can you take me down there [to the police station] and search me?"

Defendant Douty: "What difference does it make?"

Ms. Torres: "Because I am freezing, and I don't have any panties on."

Defendant Douty: (Yelling) "We would have been done by now if you were cooperating. Knock it off."

47.     Defendant Hamm continued to insist that Ms. Torres permit an unconstitutional search, demanding that she move her legs apart. Ms. Torres responded "I'm begging you guys to take me down the right way and treat me the right way."

48.     Defendants continued to treat Plaintiff the wrong way. Ms. Torres was pressed down over the front of the squad car, with her head coming into view of Defendant Hamm's squad camera. Ms. Torres again asked them to treat her the right way but Defendants refused. Ms. Torres asked Defendant Douty to not put her hands in her vagina, but Defendant Douty refused to listen.

49.     Despite pushing her over the car and having Defendant Hamm hold her, Defendant Douty was unable to find anything in her search. Defendant Douty and Defendant Hamm asked Ms. Torres what was in her vagina. She told them that there was nothing there but now asked that they bring her to the hospital to be searched there.

50.     Defendants refused, saying that they could feel "something in your crotch." Defendant Hamm instructed Ms. Torres to spread her legs again. Near tears, Plaintiff pleaded with the Defendants "Why won't you guys take me in the right way? What you're

doing ain't right."  In response, she was told to move her feet.  "If you're detaining me, take me down there then."

51.    Defendant Douty asked Defendant Hamm what he wanted to do.  Ms. Torres again asked them to take her in and treat her the right way.  Defendant Hamm considered driving her but said that someone would have to ride with her.

52.    Ms. Torres said she would ride with them and that she was cold.  But Defendant Hamm was not done humiliating Ms. Torres for the evening.  He claimed that if Ms. Torres rode with them her leggings were so tight that something would fall out of them.  Ms. Torres told them that this was ridiculous and that she could jump up and down.  Defendant Hamm noted that her legs were apart and asked her again to let Defendant Douty proceed with the vaginal search.

53.    Ms. Torres again refused and stated why:  "Because she doesn't have the right to put her hand in my vagina."  This was as clear as possible communication from Ms. Torres to both Defendants that she had rights and they were violating her rights without her consent.

54.    Defendant Hamm suggested that since Defendant Douty could feel something even though neither officer knew what it could be, they could continue to search her.  They again said they thought it was a baggie.  Defendant Douty said, "It's something. I feel something.  I don't know what the hell it is."

55.    The small amount of drugs found in the brim of Mr. White's baseball hat in an illegal search did not create a reasonable suspicion of illegal activity by his passenger,

Ms. Torres.  Neither did feeling an unknown object in her vagina, which was clearly not a weapon or other device that posed a risk to officer safety.

56.    Defendant Hamm ignored everything Ms. Torres said.  Instead he replied, "So are you going to let my partner search you or no?"  Ms. Torres again said that she wanted them to take her to the station.  Both Defendants refused.  Defendant Hamm asked her why she wanted to be taken to the station, to which Ms. Torres respectfully responded that she wanted them to search her "properly instead of on the side of the road.  I'm cold sir."

57.    Instead of respecting her request, both Defendants continued to insist that Ms. Torres submit to an unconstitutional search.  They claimed that Ms. Torres would dispose of whatever she had in her vagina.  Ms. Torres pleaded with both Defendants to treat her with respect and in accordance with law.  Ms. Torres was extremely distraught and feeling helpless.  "This is crazy.  I can't believe this is happening."

58.    Ms. Torres's situation only got worse.  Instead of respecting her rights, Defendants' mistreatment of Ms. Torres intensified.  Defendant Douty decided she would try to "loosen" whatever was in Ms. Torres's vagina and began to massage Ms. Torres's vagina.  Ms. Torres objected immediately, reminding Defendant Douty "I have no underwear on, I feel extremely violated right now."  Defendant Douty responded only that "I feel something," but again could not identify it.

59.    Ms. Torres again told them what they were doing wasn't right and that they should take her to the station.

60.     Defendant Hamm then suggested that they put her in the back of Defendant Douty's squad car where Defendant Hamm, and not the female Defendant Douty, could sit with her.  Ms. Torres agreed with this proposed plan and said again that the Defendants' behavior "was nuts."

61.     Defendant Hamm blamed Ms. Torres for the problem.  Defendant Hamm said that, had Ms. Torres submitted to a cavity search on the side of the road, she would at least have been able to put her coat back on.

62.     Ms. Torres told him that she had been calm the entire time, which Defendant Hamm took as an opportunity to ask her, yet again, to let Defendant Douty search her on the side of the road.  Ms. Torres again refused to consent to such a violation and requested going to the station instead.  Defendant Hamm yelled at her and asked what going to the station had to do with anything.

63.     Ms. Torres responded, "You can ride with me in the car, because I'm cold and I don't want her sticking her hands in my vagina out here.  I have no problem getting naked at the police station in a cell or whatever.  I'm good then.  I'm just really cold." Defendant Hamm admitted that he was cold too, even though he was wearing a coat.

64.     Ms. Torres again asked if they could take her to the station.  Instead of answering her, Defendant Hamm talked to Defendant Douty.  While doing so, Ms. Torres said she wasn't hiding anything.  Defendant Hamm took that as an opportunity to try searching her again.  He told Ms. Torres "put your legs open like that and let my partner search you."

65.     The squad car audio clearly captured what happened next:

Ms. Torres: "I don't want her hands all up in my vagina."

Defendant Hamm: "How else are we going to search you when she feels a baggie in your crotch?"

Ms. Torres: "She don't feel a baggie in my crotch, but if we go down there, then she can search me. Whatever, I can squat and cough and get undressed the right way you know, like instead of on the side of the highway. I'll jump up and down, look."

Defendant Hamm to Defendant Douty: "You want me to drive? You want me to drive your car?"

Ms. Torres: "Will you please just take me down there?"

Defendant Hamm: "Open your legs."

Ms. Torres: "This isn't right I don't think."

Defendant Hamm: "Open your legs, now."

Ms. Torres: "You're harassing me."

Defendant Hamm: (yelling) "Open your legs."

Ms. Torres: "Jesus Christ, you're not going to put her hand in my crotch, there's nothing hanging out. Dude, nothing is going to fall out, I want you to do this the right way."

Defendant Hamm: "This is the right way."

66.     Ms. Torres again told them that they should "follow the law, arrest me and take me in to search me."  Ms. Torres reminded them that she was cold and asked if they would let her have her jacket.  Defendant Hamm simply said no to that request.  Ms. Torres again told them what they were doing wasn't right.

67.     The Defendants continued to punish Ms. Torres for asserting her rights.  Ms. Torres told the Defendants that she was very cold.  Defendant Hamm said he did not care. He said, "No, you lost your privileges now, you're going to stand out here and be cold with us."  Defendant Hamm and Defendant Douty were wearing their Rock County Sheriff-issued uniforms and coats.  Ms. Torres was wearing leggings with no coat.  Ms. Torres said she didn't understand what he meant by losing her privileges.  Defendant Hamm clarified that she wasn't getting her a coat "because you won't allow us to search you."

68.     Ms. Torres again said she didn't want to be searched on the side of the road and asked to be brought to the station to be searched.  Defendants did not bring her to the station.

69.     Defendants then questioned Ms. Torres about Mr. White and his activities and accused Ms. Torres of coming to buy drugs.  This was the first time since being removed from the car that Defendants asked her about Mr. White.  She was never asked about the air freshener that Defendant Hamm claimed was the reason for the stop.

70.     Ms. Torres asked Defendants to call someone to verify her story but Defendant Hamm said he would not investigate because "you burnt your bridge."

71.     Ms. Torres again asked if they would put her inside a car where she could get warm, but Defendant Hamm told her no.

72.     Ms. Torres, after a long night of being violated by officers on the side of the road, began to cry and repeated her request to be put someplace warm.  Defendant Hamm said that, because she was fighting the search, she could not go into the car.

14

73.     Defendant Hamm then told Defendant Douty that he could shine a flashlight on Ms. Torres's vagina for Defendant Douty in order to help her search.

74.     Ms. Torres immediately objected to that proposal and again asked them to do things the right way.  Defendant Douty said, "We are doing it the right way, if you would have cooperated we would have been done by now."  Defendant Hamm told her, "You would have been a long time in a warm vehicle but you're not cooperating."

75.     Defendant's actions throughout this incident clearly indicated that Ms. Torres's dignity did not matter and that they could punish her however they wanted.

76.     Defendants Hamm and Douty continued to question Ms. Torres about her night.  Ms. Torres again said that she was cold and asked if they would take her down and search her the right way.

77.     Defendant Hamm said they didn't have another car right now so she should just let Defendant Douty search her.  Ms. Torres refused.

78.     She told them that she was really cold.  Defendant Hamm dismissed her concerns again and said, "I'm cold too, it's cold out, that's why we're cold."  Ms. Torres asked to be allowed in the car but Defendant Hamm simply said, "Nope."

79.     Defendants Hamm and Douty then talked between themselves.  After a few minutes, Ms. Torres asked if they cared that she was freezing to death.

80.      Defendant Hamm told Ms. Torres that she was mixed up in the arrest, but admitted that so far she wasn't under arrest. Ms. Torres, however, was handcuffed and unable to leave, and Defendant Hamm had already refused to allow anyone to pick her up.

81.     Defendants then radioed to see if another deputy or a state trooper could come to assist.  Ms. Torres asked why she could not get into the car since she was handcuffed.  Defendant Douty said that Ms. Torres would reach into her pants and get rid of whatever she had.  Ms. Torres was stunned, asking, "And get rid of it in the cop car?" Defendant Hamm said, "Yeah, exactly."

82.     After being informed by dispatch that no one was able to come, Defendant Hamm told Ms. Torres that he was wearing pants too and that he was cold.  Ms. Torres told him that her "hands are so cold."  Defendant Hamm said that she just had to let Defendant Douty search her. Ms. Torres again refused. Upset over Ms. Torres refusing to consent to an unlawful search, Defendant Hamm told her that "this is all your doing."  Ms. Torres told Defendant Douty that she couldn't feel her hands anymore.  Defendant Douty, responded, "It's ten degrees out, it happens."

83.     Eventually, Defendants got another car to come and pick up Mr. White. Defendant Hamm moved Ms. Torres and Mr. White's possessions into the squad car, but still refused to let Ms. Torres into a car.

84.     While standing next to his car, Defendant Hamm again questioned Ms. Torres about her night.

85.     Another officer came up to Defendant Hamm. The new officer remarked that "It's freezing." Both officers blamed Ms. Torres for her predicament. The squad car audio recording picked up the conversation:

Ms. Torres: "You guys know it's not even fucking 10 degrees out right now."

New officer: "It's freezing outside. You know what we are freezing too."

Defendant Hamm: "You made this, you made this decision."

Ms. Torres: "No, I did not."

Defendant Hamm: "Yes you did because you didn't allow my partner to search you."

Ms. Torres: "I know the law, but you can take me down there and search me, you don't search somebody on the side of the fucking road when it's below zero. There's no sense in it."

86.     Defendant Hamm responded that he searched Mr. White, and the new officer told her that it didn't matter how cold it was, she had to be searched. At this point there was still no legal authority to support a search.

87.     Ms. Torres again asked them to take her to the station. Defendant Hamm replied that they were working on it.

88.     After talking with Ms. Torres, they finally brought her to Deputy Douty's car where she was placed in the back seat.

89.     Defendants kept Ms. Torres outside without a coat for over 30 minutes. According to the National Weather Service, the temperature was 9 degrees Fahrenheit with a 12mph wind, making the wind chill -6 degrees Fahrenheit.

**Unlawful Search at the Hospital**

90.     Defendant Douty brought Ms. Torres to a hospital where she instructed a nurse to search and remove what turned out to be a pipe from Ms. Torres's vagina.  On information and belief, Defendant Douty did not have a warrant for such a search.

17

**Subsequent Legal Matters**

91.     Ms. Torres was charged with possession of drug paraphernalia. On February 16, 2019, Assistant Rock County Attorney Jeffrey L. Haubrich filed a motion to dismiss the criminal charges filed against Ms. Torres based upon "further review of the case files and in consideration of omnibus issues raised by the defense."

92.     On information and belief, after the case was dismissed, Sheriff Verbrugge failed to investigate the conduct of his deputies.

**Warrantless Strip Searches and Body Cavity Searches**

93.     Warrantless strip searches and body cavity searches of persons arrested or detained for a traffic offense are unreasonable under the Fourth Amendment unless there is probable cause to believe that the subject of the search is concealing a weapon, evidence of the commission of a crime, or contraband.

94.     Ms. Torres was detained because she was the passenger in a car pulled over for an air freshener violation.

95.     Neither Defendant Hamm nor Defendant Douty had probable cause to believe Ms. Torres was concealing a weapon, evidence of the commission of a crime, or contraband.

96.     Neither Defendant Hamm nor Douty had particularized reasonable suspicion to believe Ms. Torres was concealing a weapon, evidence of the commission of a crime, or contraband.

97.     There were no exigent circumstances requiring the search to be conducted without a warrant on a public on-ramp to a busy major interstate highway.

98.     Neither a strip search nor a full body cavity search was necessary for officer safety.

99.     Prior to the search Ms. Torres was detained but not under arrest, and Ms. Torres was not a convicted prisoner.

100.    Neither Defendant Hamm nor Defendant Douty had a search warrant for Ms. Torres's person.

101.    Minnesota law prohibits body cavity searches of a person arrested or detained for a traffic offense in any place where the search can be observed by any person other than the persons physically conducting the search.

102.    Minnesota law prohibits body cavity searches of a person arrested or detained for a traffic offense by anyone other than a licensed physician, registered nurse, or practical nurse.

**Failure to Train by County**

103.    It is extremely likely, amounting to a near certainty that Rock County deputies routinely engage in pretextual stops under the Fourth Amendment after having observed a car either near suspected drug locations, or drivers with previous criminal activity relating to drug use.

104.    In such a situation there is generally no reasonable, articulable grounds for suspecting a passenger in the vehicle possesses narcotics, weapons, or contraband.

105.    The Rock County Sheriff's Office has no policy to guide officers in such situations, and does not train officers on what to do in such situations.

106.    The risk of unconstitutional strip searches and/or body cavity searches for

narcotics and/or contraband is so obvious that the County's failure to train its deputies on what searches are permissible in this type of recurring traffic stop situation was the moving force behind the unlawful and prolonged seizure of Plaintiff for the purpose of conducting an unlawful search of Plaintiff's vagina.

### Damages

107.   Plaintiff suffered and continues to suffer:

    a.   Humiliation,

    b.   Indignity,

    c.   Disgrace,

    d.   Stress,

    e.   Fear,

    f.   Embarrassment,

    g.   Mental suffering,

    h.   Fear of police.

108.   The actions of Defendants and each of them proximately caused all the damages Plaintiff suffered.

### Punitive Damages

109.   The actions of Defendants Hamm and Douty in subjecting Ms. Torres to an unlawful and prolonged seizure for the purpose of conducting an unlawful search of Plaintiff's vagina and forcing her to stand in below-freezing windchill without a coat shocks the conscience and is reprehensible.

110.   These actions by Defendants were undertaken with knowledge that Ms.

Torres did not consent to their conduct and that such conduct violated the United States Constitution and Minnesota law.

111.   The search of Plaintiff's body was also proximately caused by Defendant Hamm, who made the call for a female officer to conduct the search with no legal justification to do so.

112.   The purpose of punitive damages is deterrence and retribution.

113.   The conduct of Defendant Hamm was unlawful and is capable of repetition, which must be deterred.

114.   The conduct of Defendant Douty was unlawful and is capable of repetition, which must be deterred.

115.   An award of punitive damages would bear a reasonable relationship to the harm suffered and to damages in similar cases.

116.   As such Plaintiff is entitled to punitive damages against Defendant Officers Hamm and Douty.

## COUNT I
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983
## FOURTEENTH AMENDMENT – SUBSTANTIVE DUE PROCESS
## AGAINST DEFENDANTS HAMM AND DOUTY

117.   Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

118.   The search of Plaintiff was proximately caused by Defendant Hamm calling for a female deputy to perform the search.

119.   The circumstances of the warrantless roadside prolonged seizure of Plaintiff

for the purpose of conducting a warrantless body cavity search by Defendant Douty were
so egregious and so outrageous that it shocks the contemporary conscience.

120.   The conduct of Defendant Douty was the natural result of Defendant
Hamm's call for a female deputy.

121.   Defendant Hamm and Defendant Douty violated Plaintiff's established
right to substantive and procedural due process.

122.   Defendant Hamm has no qualified immunity because Plaintiff's right to be
free from an unreasonable prolonged seizure for the purpose of conducting a warrantless
body cavity search on the side of the road was clearly established at the time.

123.   Defendant Douty has no qualified immunity because Plaintiff's right to be
free from an unreasonable prolonged seizure for the purpose of conducting a warrantless
body cavity search on the side of the road was clearly established at the time.

124.   Strip and body cavity searches must be designed to minimize emotional and
physical trauma, and must be conducted in private.  If a lawful strip and body cavity
search may be conducted at all, Officers must transport a suspect apprehended in public
to a private facility to conduct the search.

125.   In the alternative, even if Defendants had probable cause to believe Plaintiff
had narcotics or contraband on her person (which they did not), there were far less
intrusive search methods they could have used.

126.   As a direct result of the actions of Defendants, Plaintiff suffered the
damages outlined above.

127.   Wherefore, as a direct and proximate cause of the actions of Defendants,

Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983**
**FOURTH AMENDMENT - UNREASONABLE SEARCH AND SEIZURE**
**AGAINST DEFENDANT DOUTY**

128.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

129.    The Fourth Amendment requires that, the greater the intrusion, the greater must be the reason for conducting the search.  Thus, body cavity searches require a higher level of suspicion than other searches.

130.    The body cavity search of Plaintiff's vagina by Defendant Douty was an unreasonable and warrantless search under the Fourth Amendment in that:

    a.  There was insufficient justification for initiating the search.

    b.  The scope of the particular intrusion was unreasonable.

    c.  The place in which the search was conducted was unreasonable.

    d.  The manner in which the search was conducted was unreasonable.

    e.  Defendant Douty lacked reasonable suspicion, much less probable cause to search Plaintiff's vagina.

    f.  There were no exigent circumstances requiring the search immediately on the side of the road.

    g.  There was no exception to the warrant requirement for the search.

131.    Plaintiff's conduct was nowhere near sufficient to justify the prolonged seizure and roadside search that occurred in this case.

132.    Defendant Douty violated Plaintiff's established right to be free from prolonged seizures and unreasonable body cavity searches.

133.    Defendant Douty has no qualified immunity because Plaintiff's right to be free from prolonged seizures unreasonable body cavity searches of the sort that occurred here was clearly established at the time.

134.    As a direct result of the actions of Defendant Douty, Plaintiff suffered the damages outlined above.

135.    Wherefore, as a direct and proximate cause of the actions of Defendants, Plaintiff has suffered damages in an amount to be determined at trial

**COUNT III**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983**
**FOURTH AMENDMENT – EXCESSIVE FORCE**
**AGAINST DEFENDANTS HAMM AND DOUTY**

136.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

137.    The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment.

138.    A law enforcement officer is liable for the use of excessive force and the failure to intervene to prevent the unconstitutional use of excessive force by another officer.  The test is whether the amount of force used was objectively reasonable under the particular circumstances.

139.    Circumstances relevant to the reasonableness of the officer's conduct include the severity of the crime at issue, whether the suspect poses an immediate threat

to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

140.    "[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."[1]

141.    The invasive vaginal cavity search on the side of a public road of a person who is not under arrest and who has not presented any sign of danger or concealment of evidence or contraband constitutes objectively unreasonable excessive force.

142.    The individual Defendants' use of force against Plaintiff was excessive and unreasonable.

143.    Wherefore, as a direct and proximate result of the actions of Defendants Hamm and Douty, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983**
**MONELL - FAILURE TO TRAIN**
**AGAINST DEFENDANTS ROCK COUNTY AND SHERIFF EVAN VERBRUGGE**

144.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

145.    At all times relevant, Defendants Rock County and Sheriff Verbrugge had a duty to properly train, supervise, and discipline its employees and agents.

146.    Rock County and Sheriff Verbrugge breached that duty, by, inter alia:

---

[1]      *Small v. McCrystal,* 708 F.3d 997, 1005 (8th Cir. 2013).

a.  Improperly training, authorizing, encouraging or directing officers on proper search and use-of-force policy.

b.  Failing to discipline officers for violations of law and policy related to illegal search and use of force.

147.    The policy, pattern of practice, or custom of unconstitutional conduct is tacitly or overtly sanctioned, as evidenced by the conduct of Defendants Douty and Hamm and the failure of the County, the Sheriff's Office, and Sheriff Verbrugge to train, supervise, investigate, and discipline deputies.

148.    This unconstitutional behavior of the deputies in this matter has been carried out pursuant to a policy, pattern of practice, or custom, whether formal or informal, which violates the constitutional rights of persons such as Ms. Torres.

149.    Sheriff Verbrugge failed to take sufficient remedial actions to end this policy, pattern of practice, or custom within the Sheriff's office.

150.    The failure to end this policy, pattern of practice, or custom was a proximate cause of the injuries suffered by Plaintiff.

151.    Wherefore, as a direct and proximate cause of the actions of the defendants, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT V**
**MINNESOTA STATE LAW CLAIM ART 1 § 10 – Unlawful Seizure**
**AGAINST ALL DEFENDANTS**

152.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

153.    Defendants Hamm and Douty subjected Plaintiff to an unlawful seizure in violation of the Minnesota Constitution, Article 1, § 1, in that said Defendants detained

26

Plaintiff without lawful authority and without judicial review.

154.    As a proximate result of Defendants' unconstitutional policies, practices, customs, lack of supervision, failure to train, acts, and omissions, done under color of law and official authority, Plaintiff suffered significant deprivations of her constitutional rights detailed in the preceding causes of action, and her Article 1 § 10 Minnesota constitutional right to be free from unreasonable seizures. The failure to train was done with such deliberate indifference on the part of Defendants that these constitutional violations were inevitable.  Defendants' policies, practices, customs, lack of supervision, failure to train, acts, and omissions were the moving force behind these constitutional violations and the cause of such violations.

155.    Wherefore, as a direct and proximate cause of the actions of the defendants, Plaintiff has suffered damages in an amount to be determined at trial.

## <u>COUNT VI</u>
## FALSE IMPRISONMENT AGAINST ALL DEFENDANTS

156.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

157.    All of the individual Defendants named in this Complaint are employees, deputies, or agents of municipalities.

158.    All acts of the individual Defendants alleged above were conducted within the scope of the Defendants' employment or duties.

159.    The actions of Defendants were willful, malicious, and in violation of the known rights of Plaintiff.

160.    Plaintiff's initial seizure by Defendant Hamm and Douty was not supported by law. Instead, Defendants seized Plaintiff without any legal right, done under color of law and official authority, pursuant to official policy or custom and because of lack of supervision. Plaintiff's seizure constitutes false imprisonment in violation of Minnesota law.  Plaintiff's seizure is a result of Defendant Rock County's unconstitutional policies, practices, customs, lack of supervision, failure to train, acts, and omissions, which were the moving force behind this state law violation and the cause of such violation.  The failure to train was done with such deliberate indifference on the part of Defendants that this false imprisonment was inevitable.

161.    Defendants intentionally confined and restrained Plaintiff without her consent.  Defendants intentionally confined Plaintiff beyond the time permitted by law, and Plaintiff did not consent to this unlawful detention.

162.    Defendants knew they had no lawful authority to seize Plaintiff or to continue detaining Plaintiff.

163.    Wherefore, as a direct and proximate cause of the actions of the defendants, Plaintiff has suffered damages in an amount to be determined at trial.

## DECLARATORY AND INJUNCTIVE RELIEF
## AGAINST ALL DEFENDANTS

164.    This suit involves an actual controversy within the Court's jurisdiction and the Court may declare the rights of Plaintiff under the Constitution and laws of the United States and the laws of Minnesota and grant such relief as necessary and proper.  Plaintiff seeks declaratory relief on her behalf.

165.    Plaintiff seeks a declaratory judgment that the defendants' policies, pattern of practices, customs, lack of supervision, failure to train, acts, and omissions described herein violate the Fourth Amendment to the Constitution of the United States and constitute an unlawful search and excessive force in violation of the Minnesota Constitution and state law.

166.    The conduct of Defendants set forth in this Complaint is likely to continue and poses an imminent threat of future harm to Plaintiff unless restrained and enjoined by this Court.   Wherefore plaintiff is entitled to permanent injunctive relief enjoining Defendants, each of them, and all persons acting in concert with them or subject to their control or authority from continuing to engage in the conduct described herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter judgment in favor of her and against the Defendants as follows:

A.    Enter a declaratory judgment on behalf of Plaintiff that the Defendants' policies, pattern of practices, customs, lack of supervision, failure to train, acts, and omissions, described herein, constituted unlawful search and excessive force in violation of the Fourth Amendment and in violation of the Minnesota Constitution and state law;

B.    Enter judgment on behalf of Plaintiff against Defendants for reasonable damages sufficient to compensate her for the violation of her Fourth Amendment rights and rights under the Minnesota Constitution and state law;

C.    Permanently enjoin and prohibit defendants from interfering with Plaintiff's constitutional rights. Specifically, enjoining defendants from:

    a.   Retaliating against Plaintiff for bringing this lawsuit; and

    b.   Subjecting Plaintiff to unlawful seizures, searches and excessive force in the future;

D.    Enter judgment requiring the Defendants to pay punitive and other exemplary damages;

E.    Enter judgment requiring the defendants to pay Plaintiff's attorney's fees and costs as authorized by 42 U.S.C. § 1988; pre-judgment interest; and any other relief deemed necessary and proper; and

F.    Grant all other and additional relief to which Plaintiff may be entitled.

Dated: May 6, 2020

s/Ian Bratlie
Ian Bratlie (No. 319454)
American Civil Liberties Union of Minnesota
709 South Front Street, Suite 1B
Mankato, MN 56001
Tel: (651) 645-4097
ibratlie@aclu-mn.org

Teresa Nelson (No. 269736)
American Civil Liberties Union
of Minnesota
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 645-4097
Fax: (651) 647-5948
tnelson@aclu-mn.org

*Counsel for Plaintiff Kelli Jo Torres*